## H. B. MUDD, Appellant, v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, Respondent.

### St. Louis Court of Appeals, January 4, 1910.

1. **RAILROADS: Inspection Car is Locomotive Engine, Within Meaning of Statute.** An inspection car, propelled by a steam engine placed in the center thereof, designed for the use of officials in inspecting the road, which is intended to carry passengers, and which is equipped with a bell and steam whistle is a "locomotive engine," within the meaning of section 1102, Revised Statutes 1899 and of a municipal ordinance prohibiting the running of a "locomotive engine" at a greater speed than ten miles per hour and requiring a bell to be continuously rung on every "locomotive engine" being propelled through the city.

2. ——: **Instructions: Running Inspection Car.** In an action for damages caused by plaintiff's horses taking fright at an inspection car on a railroad track and running away, an instruction for plaintiff which required the jury to find that the close proximity of said team to defendant's track was caused by defendant's running its locomotive engine (if it did run one) at a greater rate of speed than permitted by ordinance, did not submit the question whether the inspection car was a "locomotive engine" within the meaning of the ordinance, the words "if it did run one" meaning not to ask a finding whether the inspection car was a locomotive engine, but to ask whether defendant ran it at the time and place in question.

3. ——: **Evidence: Failure to Ring Bell.** The testimony of the driver of a team, which was frightened by an inspection car operated on a railroad track, that the bell was not rung nor whistle sounded until the car was on the crossing, and that he did not see the car because he was behind a building, is positive, and not negative, evidence, and is for the jury to weigh in comparison with contradictory testimony.

Appeal from Monroe Circuit Court.—*Hon. David H. Eby,* Judge.

REVERSED AND REMANDED.

*W. T. Ragland* and *James P. Boyd* for appellant.

(1)  Defendant's instruction number 7 was error for the reason that it submitted a question of law to the jury.  While various of the witnesses who testified had little knowledge as to the character of the car which proved to be an inspection car, some of them calling it a "dinky," yet the essential characteristics of the engine which furnished the propelling power for the car were not in dispute.  Had there been any direction given the jury as to the car at all, it should have been declared as a matter of law that the engine which propelled the inspection car was a locomotive engine.  If the substantive facts are undisputed, or if the facts proved are such that reasonable men can draw but one conclusion from them, the matter evolves itself into a question of law.  Knorpp v. Wagner, 195 Mo. 637; Henley v. Globe Refinery Co., 106 Mo. App. 20.  (2)  A locomotive is defined as a "self-propelling steam engine which travels on wheels; specif., one designed to use on a railroad." 3 Universal Dictionary, p. 2948.  (3)  The vehicle was referred to in the petition as a "locomotive engine and car."  The ordinances introduced in evidence direct their penalties against the failure to keep a bell ringing on "any locomotive engine."  Sec. 1102, R. S. 1899, provides that "a steam whistle should be attached to such engine (locomotive engine) and be sounded at least eighty rods from the place where the railroad shall cross any such road or street," etc.  The essential characteristics of the engine which propelled the inspection car being undisputed, it is a question of law, not of fact, as to whether it was "a locomotive engine" within the meaning of the city ordinances and statutes, and it was therefore error of the court to submit such questions to the jury.  Henderson v. Railroad, 110 Mo. App. 595.

*Geo. P. B. Jackson* for respondent.

The first paragraph of the petition on which alone plaintiff went to the jury, declared for damages resulting from alleged violations of two municipal regulations of the city of Monroe, one of which prohibited a person, corporation or company, owning or operating any railroad cars or locomotive engine, from running the same within the corporate limits of the city at a greater speed than ten miles an hour, and the other required every person, corporation or company, owning, operating or controlling any locomotive engine or railroad cars in the city limits, to attach a bell to every such engine running or being propelled through the city, and cause said bell to be continuously rung while passing through the city. A breach of either of the regulations was declared to be a misdemeanor and punishable by fine. The purpose of this action is to recover for injuries to a team, road wagon and harness belonging to plaintiff, which injuries are ascribed to the team running away from fright at a locomotive engine operated on defendant's railway in disregard of the aforesaid regulations. The fright and runaway are alleged to have been caused by the team being driven too near an engine operated at a speed in excess of the ordinance rate and without giving warning of its proximity by the ringing of a bell. The second paragraph of the petition counts on injuries charged to have been due to the engineer in charge of the engine carelessly and unnecessarily sounding, when near plaintiff's team, a steam whistle while the engine was passing over a crossing and after it had passed over. A brother of plaintiff was driving the team northward on Main street in said city, and toward defendant's track. This street was one thousand feet west of defendant's depot, where two freight trains were at the time and cars were being switched. A quarter of a mile west of Main street was another street running north and south and parallel to it, called Kennedy street, and

one-half mile west was the city boundary, along which ran a thoroughfare known as Border street. Defendant's railway extends east and west through the town, intersecting the north and south streets we have mentioned at right angles. The railroad runs on a dump considerably higher than Main street is south of the track, and probably a locomotive on the track would have been visible to the driver of plaintiff's team as far west as Border street at most points; but a cabin standing about sixty feet south of the track, with some trees behind it, more or less cut off the view of the tracks to the westward, though the extent of the obstruction is in dispute in the testimony. The driver said his attention was attracted by the two freight trains at the station to the east as he drove northward, and he stopped at a culvert one hundred and fifty feet south of the railroad crossing until he saw he could go ahead without danger to the team from the trains. He testified he neither saw nor heard an approaching train from the west, and knew nothing of the proximity of the engine which frightened the horses until it was nearly on him at the crossing, though he looked and listened for a train from the west; that his view was obstructed by the cabin and trees mentioned; that when within twenty or thirty feet of the crossing an engine ran over the crossing from the west, whistling and ringing the bell and thereby frightening the horses, which ran back, pitched him over and ran away. There was testimony that prior to this incident the horses were gentle, not afraid of trains and never had run away, but afterwards could not be driven near an engine, and on two occasions took fright and ran away; that before the first fright they were reasonably worth seven hundred dollars, and afterwards were worth only three hundred dollars; that plaintiff paid small sums for repairs to the wagon and harness. The engine or vehicle at which the horses took fright is denominated an "inspection car," and was used by the offi-

cials of the company to ride over the road when inspecting culverts and bridges. It was twelve feet high, twenty feet long, had an upright boiler in the middle with a canopy top, had a carrying capacity of six passengers, was operated by steam, had a bell and whistle like those on an ordinary locomotive, its average running speed was twelve to eighteen miles an hour, and its weight sixteen thousand pounds when equipped with coal and water. One witness described it as resembling a large automobile car with two seats in front facing forward, and immediately back of those seats the engine and boiler. The engineer rode in the rear of the car and was both engineer and fireman; the water was carried in a tank on top or at the sides of the boiler, the coal in a bin in the rear of the car, and the boiler was about four feet in diameter. The roof was seven feet from the floor and the floor six inches from the track; the wheels were on the sides of the vehicle, with the rear seat extending over them. It carried a headlight a little smaller than a regular engine and a bell about as large as an engine bell. Both briefs concede there was contradictory testimony on the main issues of fact, but perhaps do not entirely agree what those issues were. The first instruction was as follows:

1. "The court instructs the jury that if you find and believe from the evidence in the cause, that on or about the 2d day of May, 1904, one William Mudd was at the instance and direction of the plaintiff, driving a team of horses and road wagon belonging to plaintiff, north on Main street in Monroe City, Missouri, toward the point where said street is crossed by defendant's railroad tracks; that said team was a reasonably safe one to drive in the proximity of railroad tracks being operated by railroad companies, and that as he approached the defendant's said track, he stopped at a reasonably safe distance therefrom, considering the character and disposition of said team, and looked and listened for the approach of engines and trains, and saw and heard,

none, that after so stopping, looking and listening, he, while in the exercise of ordinary care and caution, if such is the fact, continued to approach said track and when within a few feet thereof, defendant's agents, servants and employees, ran a locomotive engine over its track at said point and in front of said team, thereby frightening it, on account of its close proximity to the said railroad track, and causing it to run away, by which it was injured and plaintiff's road wagon and harness were broken and injured; and if you further find that the close proximity of said team to defendant's track at said time and place (if so the jury find) was caused or brought about by defendant's running its said locomotive engine (if it did run one) at a greater rate of speed than ten miles an hour within the corporate limits of Monroe City, or by the failure, if any, of the defendant company to cause to be continuously rung a bell attached to such engine while it was passing through the corporate limits of said city, then your verdict must be for the plaintiff on the first count of the petition."

A verdict was returned for defendant and plaintiff appealed, assigning for errors that the court compelled him to elect between two counts of his petition and gave two misleading instructions at defendant's request.

GOODE, J. (after stating the facts).—The court advised the jury if they found from the evidence the vehicle called by the witnesses an "inspection car" was not a locomotive engine, then it was not subject to the statutory regulation requiring a whistle to be sounded or a bell rung when approaching a road or street crossing in the city of Monroe. The petition counted on a municipal regulation and not on the statute, as the instruction implied. However, we have no doubt the car or engine which frightened the team was a locomotive engine within the meaning both of the city ordinance and of the statute requiring a bell to be rung or a whistle sounded by a

locomotive when within eighty rods of the intersection of a railroad and a road or street (R. S. 1899, sec. 1102). The statute and the ordinance were alike intended for the protection of persons and property crossing or about to cross railway tracks. [Evans v. Railroad, 62 Mo. 49.] Every reason for exacting a warning by whistle or bell when an ordinary locomotive draws near a crossing, applied to the inspection car, which was as dangerous to travellers as a common locomotive. Besides, it was, by strict definition, a locomotive engine, being a vehicle moved by a steam engine and designed to run over the track of a railroad from place to place. [Jarvis v. Railroad, 65 N. E. (Ind.) 608; O'Fallon v. Railroad, 171 Mass. 249; Stranahan v. Railroad, 84 N. Y. 308; Webster's Int. Dict. (1910 Ed), p. 1267, word "Locomotive."] It is true the name "locomotive engine" is usually understood to signify a steam engine used to draw a car or train of cars along a railroad track (Murphy v. Wilson, 52 L. J. Q. B. 524) and the engine in question drew neither, but being in the middle of the car, propelled it along the track. This unlikeness to an ordinary locomotive should not be held to constitute it an engine of another sort than a locomotive engine within the meaning of the municipal ordinance or the statute. Plainly such an engine could do the very mischief at a crossing which both the statute and the ordinance were enacted to prevent. In Henson v. Railroad, 110 Mo. App. 595, 85 S. W. 597, this court held a vehicle called a "speeder," which was like a handcar, and operated by a small gasoline engine underneath the floor of the car, was not a locomotive engine within the intention of section 1106 of the Revised Statutes of 1899; saying the word "locomotive" was used in the section in connection with the word "train" and meant a steam locomotive in common use by railroad companies for the purpose of moving trains and cars. That contrivance was altogether different from the vehicle in question, which, as said, was a car intended to carry passengers and to be

propelled over the railroad tracks by a steam engine. Moreover it was equipped with a bell and steam whistle of the ordinary size, to be rung or blown as those on common locomotives are. We hold the court committed error prejudicial to plaintiff in leaving it to the jury to say whether or not the inspection car was a locomotive engine.

Counsel for defendant insists plaintiff ought not to be heard to complain of this instruction, because, in the first instruction granted at his request, he made an issue for the jury as to the character of the engine in the last paragraph. Defendant's counsel reasons that, by the words, "if it did run one" (*i. e.*, a locomotive engine), etc., plaintiff left it to the jury to say whether the inspection car was a locomotive engine, because, as the fact that the defendant ran the inspection car in the city of Monroe at the time alleged, was not disputed, plaintiff's counsel could only have meant by the words "if it did run one," to submit the question of whether the inspection car, which was conceded to have been run, was a locomotive engine in the sense of the statute and the ordinance. If it could fairly be said plaintiff invited the submission of this question, his complaint would not be heeded; but we cannot say this is the effect of the first instruction. We grant it was unnecessary to ask the jury to say whether the inspection car was operated over defendant's track in Monroe City at the time of the accident. But the sense of the words "if it did run one," when read in connection with the remainder of the instruction, would be strained by holding they made the character of the car a question for the jury. Those words were meant to reiterate the hypothetical fact the jury were required to find in the preceding portion of the instruction, namely, that "defendant's agents, servants and employees ran a locomotive engine over its track at said point," etc., meaning not to ask a finding of whether the inspection car was a locomotive engine, but to ask what was, perhaps, an unnecessary finding:—

whether defendant ran it at the time and place in question.

It is contended all the substantial evidence on the issue tended to prove the bell on the inspection car was rung continuously as it approached the crossing, but this position is untenable. The driver of the team testified unequivocally the bell was not rung nor the whistle sounded until the car was on the crossing, and he did not see the car because he was behind the shanty and it gave him no warning. That testimony was of a positive instead of a negative character, and was for the jury to weigh in comparison with contradictory testimony.

Plaintiff voluntarily, and not by compulsion of the court, elected to stand on the first count of the petition.

We say nothing about whether the supposed alteration in the disposition of the horses in consequence of their fright is a proper element of damages, as the point had not been briefed and there were items of damages consisting of money paid for repairs to the wagon and harness.

The judgment is reversed and the cause remanded. All concur.